```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
                     WESTERN DIVISION
```
_____

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )
                               )
vs.                            )    Cr. No. 09-20063-MaV
                               )
GREG TAYLOR,                   )
                               )
        Defendant.             )
_____

                    REPORT AND RECOMMENDATION
_____

The defendant, Greg Taylor, has been charged in an indictment with possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g). Presently before the court is Taylor's motion to suppress evidence seized by law enforcement officers during a September 17, 2008 warrantless search of the backyard of his residence located at 2080 Labelle Street in Memphis, Tennessee. Taylor claims that he had a reasonable expectation of privacy in the curtilage of his residence and that the search of his curtilage was conducted in violation of his Fourth Amendment rights because no exception to the Fourth Amendment warrant requirement existed. The motion was referred to the United States Magistrate Judge for an evidentiary hearing and a report and recommendation pursuant to 28 U.S.C. 636(b)(1)(B)-(C).

An evidentiary hearing was held on March 22, 2010, continued to March 24, 2010, and completed on March 26, 2010. At the

hearing, the government called one witness—Officer William Anderson.  Taylor called two witnesses, Officer Marcella Weaver, f/k/a Marcella Benegas and Diane Davis, plus Taylor testified on his own behalf. Five exhibits were introduced and admitted into evidence: (1) an aerial view photograph of Taylor's residence and property; (2) a photograph of Taylor's backyard; (3) the aerial view photograph of Taylor's residence and property with markings by Officer Anderson; (4) the CD recording of 911 call by Diane Davis; and (5) a photograph of Taylor's house.

After careful consideration of the testimony of the testimony of the witnesses, the exhibits, and the entire record in this cause, the court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be granted.

PROPOSED FINDINGS OF FACT

On September 17, 2008, at approximately 9:00 p.m., Diane Davis ("Davis") called 911 to report a domestic disturbance at 2080 Labelle Street in Memphis, Tennessee.  Davis relayed to the 911 operator that Taylor, her boyfriend, was armed and had fired shots. Davis described Taylor's clothing as a dark blue shirt and blue pants.  Memphis Police Department Officers William Anderson and Marcella Weaver responded to the dispatch call and arrived at 2080 Labelle shortly thereafter.  Upon arrival, the officers saw a male fitting Taylor's description walk to the rear of the home and return to the front of the house.  The officers also observed

Davis, Davis's son, and Davis's daughter standing in front of the house, near the driveway.

The officers approached the four people standing in front of the home to inquire as to what happened. Officer Anderson conducted a pat down of Taylor which produced no weapons. Both officers thought that Taylor appeared intoxicated and that his demeanor was angry and argumentative, although not combative. Due to Taylor's argumentative demeanor, the officers detained Taylor in a squad car for safety purposes.

Davis stated that she and her son wanted to leave the premises. In the interest of safety, Officer Weaver accompanied Davis into the residence in order for Davis to gather her belongings. While in the residence, Davis told Officer Weaver that Taylor had fired shots at Davis and her son. Officer Weaver relayed this information to her partner—telling her partner that they had a crime scene. While Officer Weaver does not recall what Officer Anderson did at that time, Officer Anderson testified that he went to the backyard to look for any additional people and the gun.

In the backyard, Officer Anderson recovered a Harrington and Richardson .32 caliber revolver loaded with five live rounds. The revolver was found lying on top of a lawnmower and under a recycling bin in the backyard. The lawnmower was located immediately adjacent to the rear of Taylor's home. The officers

arrested Taylor and charged him at that time with two counts of aggravated assault in violation of state law.

At the evidentiary hearing, both Taylor and Davis denied under oath giving the officers permission to search Taylor's residence or the yard.  Neither officer remembered definitively asking Taylor or Davis for permission to search Taylor's residence or the yard.  Officer Anderson testified that Taylor denied that there was a gun present but that Taylor stated that he didn't care if the officers looked around his house for the gun.  Officer Anderson could not recall the exact words Taylor used but testified that Taylor "indirectly" said the officers could search.  Officer Anderson testified that Davis begged him to look for the gun saying "Please go look.  I don't care where you look.  Please check the back of the house."  Officer Weaver could not recall either Taylor or Davis giving consent to search Taylor's home or backyard.

Officer Anderson testified that he searched the backyard for the gun in order to confirm Davis's allegations and to secure the premises in the interest of safety. Officer Weaver testified that she did not feel an "immediate threat" of harm.

The photographs of the house and the yard introduced into evidence show a fence around the backyard.  The back perimeter of Taylor's yard is bordered by a railroad track.

During the hearing, the government sought to impeach Davis's testimony through the use of an unsworn statement she gave to

4

police shortly after the incident. Defense counsel objected to this line of questioning, and, after some discussion, the court took the objection under advisement, but allowed the government to proceed to cross-examine Davis with her prior unsworn statement. The parties submitted briefs on the issue. Upon review of the transcript and the briefs of the parties, the court finds that the unsworn statement was not inconsistent with Davis's testimony at the hearing on direct (Hearing Transcript 80:9–82:13) or on cross (Hearing Transcript 82:15-99.14; 111; 12-116:17).[1] Accordingly, the court sustains the defendant's objection, and hereby strikes the portion of Davis's testimony pertaining to the unsworn statement. (Hearing Transcript, 102:18—103:8, 119:5—130:21.)

PROPOSED CONCLUSIONS OF LAW

The government argues that Taylor's motion to suppress should be denied because: (1) the officers gained valid consent to search the premises; (2) the search fell within the scope of a protective sweep; (3) exigent circumstances were present that justified a warrantless search; and (4) the evidence found in the rear of Taylor's home was abandoned property.

---

[1] During the hearing, the court questioned whether the statement would be admissible under any of the exceptions to the hearsay rule found in Rules 803, 804, and 807 of the Federal Rules of Evidence. In its brief on the issue, the government clarified that it was introducing the unsworn statement for the sole purpose of impeachment and not for the truth of the matter asserted. Thus, the hearsay rule does not bar the government from using the prior inconsistent statement for impeachment purposes if it is inconsistent with Davis's testimony at the hearing.

police shortly after the incident. Defense counsel objected to this line of questioning, and, after some discussion, the court took the objection under advisement, but allowed the government to proceed to cross-examine Davis with her prior unsworn statement. The parties submitted briefs on the issue. Upon review of the transcript and the briefs of the parties, the court finds that the unsworn statement was not inconsistent with Davis's testimony at the hearing on direct (Hearing Transcript 80:9–82:13) or on cross (Hearing Transcript 82:15-99.14; 111; 12-116:17).[1] Accordingly, the court sustains the defendant's objection, and hereby strikes the portion of Davis's testimony pertaining to the unsworn statement. (Hearing Transcript, 102:18—103:8, 119:5—130:21.)

PROPOSED CONCLUSIONS OF LAW

The government argues that Taylor's motion to suppress should be denied because: (1) the officers gained valid consent to search the premises; (2) the search fell within the scope of a protective sweep; (3) exigent circumstances were present that justified a warrantless search; and (4) the evidence found in the rear of Taylor's home was abandoned property.

---

[1] During the hearing, the court questioned whether the statement would be admissible under any of the exceptions to the hearsay rule found in Rules 803, 804, and 807 of the Federal Rules of Evidence. In its brief on the issue, the government clarified that it was introducing the unsworn statement for the sole purpose of impeachment and not for the truth of the matter asserted. Thus, the hearsay rule does not bar the government from using the prior inconsistent statement for impeachment purposes if it is inconsistent with Davis's testimony at the hearing.

The Fourth Amendment affords a heightened expectation of privacy in both an individual's home and its curtilage. *See United States v. Dunn*, 480 U.S. 294, 300-01 (1987); *Payton v. New York*, 445 U.S. 573, 586 (1980). It is a basic principle of Fourth Amendment law that warrantless searches and seizures at a residence are presumptively unreasonable. *Payton*, 445 U.S. at 586. A search conducted without approval from a judge or magistrate is *per se* unreasonable in the absence of one of the well-delineated exceptions to the warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). Law enforcement officers may invade the privacy of an individual's home only if supported by consent, a valid arrest warrant, or exigent circumstances. *See Payton*, 445 U.S. at 590.

Taylor asserts that the search and seizure of the gun was unreasonable because he had a legitimate expectation of privacy in the curtilage of his home. In *United States v. Dunn*, 480 U.S. 294 (1980), the Supreme Court set forth four factors to determine whether an area constitutes "curtilage" of a home which should be afforded a heightened expectation of privacy associated with the sanctity of a home:

> [1] the proximity of the area claimed to the curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

6

*Id.* at 301.

According to the *Dunn* factors, the area in which Officer Anderson found the gun was the curtilage of Taylor's home. The lawnmower on which the gun was found was flush against the rear of the home, and the residence and outer property area were surrounded by a fence. In addition, the gun was underneath a recycling bin, and therefore not within plain view from a lawful vantage point. *See, e.g.*, *United States v. Jenkins*, 124 F.3d 768, 774 (6th Cir. 1997) (stating that for the plain view doctrine to apply, the item has to be in plain view and the officer viewing the officer must be lawfully located in the place from which the object is seen). It is submitted that Taylor had a legitimate expectation of privacy in this area as curtilage of his home. Thus, the search and subsequent seizure of the gun is presumptively unreasonable unless an exception to the Fourth Amendment warrant requirement is present.

A.  Consent

An exception to the Fourth Amendment warrant requirement includes an individual's voluntary consent to an otherwise impermissible search. *Schneckloth*, 412 U.S. at 222. An officer receiving voluntary consent from an individual authorized to give consent needs neither a warrant nor probable cause to conduct a constitutional search. *Jenkins*, 92 F.3d at 436. When the validity of a warrantless search is based on consent, the government has the

"burden of proving that the necessary consent . . . was freely and voluntarily given." *See Florida v. Royer*, 460 U.S. 491, 497 (1983). Whether consent is given freely and voluntarily is a question of fact to be determined from the totality of the surrounding circumstances. *See Schneckloth*, 412 U.S. at 226. Relevant factors include the age, education, and intelligence of the one giving consent, evidence of duress or coercive activity, and the presence or absence of warnings concerning constitutional rights. *See id.* Further, consent can be in the form of words, gestures, or conduct. *United States v. Carter*, 378 F.3d 587 (6th Cir. 2004).

The Sixth Circuit described its analytical approach toward determining the validity of consent to search in *United States v. Riascos-Suarez*, 73 F.3d 616 (6th Cir. 1996). There, the court stated:

> A court will determine whether consent is free and voluntary by examining the totality of the circumstances. It is the Government's burden, by a preponderance of the evidence to show through "clear and positive" testimony that valid consent was obtained. Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.

*Riascos-Suarez*, 73 F.3d at 625 (citations omitted). Knowledge of the right to refuse is one factor to consider, but the "government

need not establish such knowledge as the *sine qua non* of effective consent." *Schneckloth*, 412 U.S. at 227.

Voluntary consent is not limited to that given by the defendant, *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). A third party who possesses common authority over the premises to be searched can also consent to a search. *Id.* When determining whether a third party has common authority for purposes of valid consent, courts look at whether the third party has mutual use of property, having joint access or control for most purposes. *United States v. Matlock*, 415 U.S. 164, 171, n.7 (1974). Live-in partners have common authority over property. *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990); *see, e.g.*, *United States v. Penney*, 576 F.3d 297, 308 (6th Cir. 2009) ("We have confirmed a number of times that a live-in girlfriend has common authority over the premises wherein she cohabits with a boyfriend."). Even though an overnight guest enjoys a heightened expectation of privacy within a host's home, the overnight guest does not have authority to determine who may or may not enter the home. *Olson*, 495 F.3d at 99. The government bears the burden of showing that consent was freely and voluntarily given by a person with authority to give it. *Rodriguez*, 497 U.S. at 181.

In the present case, the government failed to prove through clear and positive evidence that consent was freely, voluntarily, and unequivocally given by a person with authority to give consent.

9

Officer Anderson's and Officer Weaver's testimony does not show that the officers gained clear and voluntary consent from Taylor. Officer Anderson did not remember specifically asking Taylor for permission to search the premises, and Officer Weaver could not recall Taylor giving permission. At best, Officer Anderson testified that he believed Taylor "indirectly" gave him consent to search.

Further, the evidence presented does not support a finding that Davis consented to a search or that she had mutual control and authority over the premises to even do so. There was no proof presented that Davis lived at Taylor's residence or whether she was even staying at his residence for even one night. Although she removed her "stuff," there was no proof of the extent and type of her "belongings." Officer Anderson couldn't recall what Davis brought out of the house other than "personal items." The officers testified only that Davis had some "belongings" in Taylor's residence that she wished to gather in order to leave the premises. Davis testified she was getting some "clothes" to leave when she and Taylor got into an argument and that Taylor took her "bag" and locked it up. Even though Davis stated that her son was taking a bath in Taylor's residence, this does not mean that Davis lived there.[2] Based on these facts, the court cannot find that Davis had

---

[2] On cross examination, Davis testified that she has lived with Taylor since his arrest in September of 2008.

10

common authority and mutual control over the premises. Therefore, Davis could not have given valid consent to the officer's search of the premises.

B.  Protective Sweep

The government also argues that the officers' search and recovery of the gun was within the scope of a protective sweep. A protective sweep is permissible when, after placing a suspect under arrest, officers have a reasonable fear, based upon specific and articulable facts, that the area to be swept may harbor an individual or individuals who present a threat to officer safety. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). A protective sweep is a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others." *Id.* at 327. The Sixth Circuit noted:

> The *Buie* Court articulated two holdings: First, during a search incident to an arrest occurring inside a home, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Second, officers may conduct a search more pervasive in scope when they have "articulable facts which taken together with the rational inferences from those facts would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."

*United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007) (quoting *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996)). Because such a sweep may be performed without a warrant, probable cause, or even reasonable suspicion, officers should limit the

11

scope of their search to areas where it is possible for individuals to hide. *Id.* Furthermore, the sweep is not a full search of the premises and should not last any longer than is necessary to dispel the reasonable suspicion of danger. *Buie*, 494 U.S. at 335-36.

A *Buie* sweep is proper when officers reasonably believe that a home or area harbors another possibly dangerous person. *See e.g.*, *Wilson v. Morgan*, 477 F.3d 326 (6th Cir. 2007) (holding that officers' had a reasonable belief that another person was present within the home after seeing a light turn on and having knowledge that a firearm could be present within). Officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007) (quoting *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996)). A *Buie* sweep may encompass looking in closets and under beds. *See United States v. Bass,* 315 F.3d 561, 564 (6th Cir. 2002); *see also United States v. Lanier*, 285 F. App'x 239, 242, 2008 WL 2744601, *3 (6th Cir. 2008) (holding that after arresting and escorting defendant from the room, the officer's search between the mattress and box springs was proper because, though the defendant's bed did not have a bed frame, there was space within for someone to hide). Furthermore, for the purposes of a *Buie* sweep, the protective sweep can include the inner area of a home

even when an individual is detained outside of the home. *See e.g.*, *Morgan*, 477 F.3d at 338-39. A key factor for a protective sweep is whether the area searched in which evidence was found could have reasonably harbored an individual. *See Buie*, 494 U.S. at 335-36.

In the case at bar, the officers found the gun in Taylor's backyard on top of a lawn mower under a recycling bin. It was not in plain view. The protective sweep happened after the officers detained Taylor in the back of Officer Anderson's squad car. Officer Anderson testified that he went to the backyard to look for shell casings and for a gun; he did not testify that he was looking for another person. Officer Anderson acknowledged that he did not have a concern about Taylor having a weapon at that point in time because Taylor was locked in the backseat of the squad car and had been frisked. Officer Weaver testified that she did not have an immediate fear of harm while Taylor was detained in the squad car. There was no proof that the officers thought another person was present in the backyard. Even if Officer Anderson had been searching for another person out of safety concerns, the limited nature of a protective sweep does not include searching under the recycling bin. According to Ex. 2, which depicted a photo of the defendant's lawnmower and recycling bin, the officer could not have reasonably believed that another individual could have been hiding on top of the lawnmower under the recycling bin. The court finds,

13

therefore, that the search and recovery of the gun was not within the lawful scope of a protective sweep.

C.   Exigent Circumstances

The government also argues that the warrantless search was lawful because exigent circumstances immediately threatened the safety of the officers and those on the premises. Warrants are required to search a person's home unless the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment. *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). Exigent circumstances traditionally exist in one of four situations: (1) when evidence is in immediate danger of destruction, *Schmerber v. California,* 384 U.S. 757, 770-71 (1966); (2) when the safety of law enforcement officers or the general public is immediately threatened, *Warden v. Hayden,* 387 U.S. 294, 298-99 (1967); (3) when the police are in hot pursuit of a fleeing suspect, *United States v. Santana,* 427 U.S. 38, 42-43 (1976); or (4) when the suspect may flee before an officer can obtain a warrant, *Minnesota v. Olson,* 495 U.S. 91, 100 (1990). *See also United States v. Saari,* 272 F.3d 804, 811-12 (6th Cir. 2001) (summarizing exigent circumstances). The government bears the burden of proving exigent circumstances existed at the time the search took place. *See Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

In this case, the government asserts that the warrantless search was justified on the basis that the officers took safety measures to secure the alleged weapon and ensure that no one else could fire it. The evidence presented at the hearing shows, however, that the officers detained Taylor prior to conducting a search of the premises. Even though the officers had probable cause to believe that a gun was on the premises—having responded to an "armed party call" for a domestic violence situation—the officers' necessity to act with exigency was diminished upon securing Taylor. In addition, the evidence shows that Davis, her son, and her daughter were the only other people present. They were in front of the house and leaving the premises, and there was no evidence of other individuals on the premises. Accordingly, the court finds that there were no exigent circumstances present, and therefore the search was unreasonable because the officers could have secured the premises and obtained a search warrant.

D.   Abandonment

A defendant has no standing to contest the seizure of contraband if he abandoned it before the seizure of the item. A warrantless search or seizure of property that has been voluntarily abandoned does not violate the Fourth Amendment. *See Abel v. United States*, 362 U.S. 217, 241 (1960). A defendant voluntarily abandons an item when he acts in such way so as to relinquish any expectation of privacy in the item. *United States v. Jones*, 707

15

F.2d 1169, 1172 (10th Cir. 1983) (holding satchel containing a handgun was abandoned when, while police were in pursuit, defendant dropped the satchel outside a building and disclaimed any ownership of the same). The capacity to claim the protection of the Fourth Amendment also depends on whether a person has a legitimate expectation of privacy in the invaded place. *United States v. Dillard*, 78 F. App'x 505, 509 (6th Cir. 2003)(citing *Rakas v. Illinois*, 439 U.S. 128 (1978)). Whether there is a legitimate expectation of privacy in a seized item incorporates two elements: "(1) whether an individual's conduct has exhibited such an expectation, and (2) whether the individuals' subjective expectation of privacy is one that society is prepared to accept as reasonable under the circumstances." *Id.*, 78 F. App'x at 509. Furthermore, an inquiry into to whether an individual has an expectation of privacy in a seized item is a question of intent, which may be inferred from spoken words, acts, and other objective facts. *Jones*, 707 F.2d at 1172.

The government asserts that Taylor abandoned the handgun when he placed it in his backyard on top of the lawn mower under the recycling bin. The facts show that Officer Anderson found the gun in an area immediately adjacent to Taylor's home and that Taylor's outer property was surrounded by a fence. Unlike the abandoned satchel in *Jones*, which was located in a public place, the gun was found on Taylor's own residential property and covered with a

16

recycling bin.  *See Jones*, 707 F.2d at 1172-73.  As previously determined, the area in which the gun was found is curtilage of the defendant's home.  The court finds that Taylor had a legitimate expectation of privacy in this area and in the gun, and therefore the gun cannot reasonably be considered abandoned property.

## RECOMMENDATION

Based on the foregoing, it is recommended that the motion to suppress be granted.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE

Date:     May 5, 2010

## NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.  28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.
ANY PARTY OBJECTING TO THIS REPORT MUST MAKE ARRANGEMENTS FOR A TRANSCRIPT OF THE HEARING TO BE PREPARED.